IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUI JIANG,<br><br>Defendant. | Case No. 1:24-CR-65 (RDA)<br><br>Hon. Rossie D. Alston, Jr.<br><br>Motions Hearing: June 5, 2024 |

### UNITED STATES OMNIBUS OPPOSITION TO DEFENDANT'S
### MOTIONS TO DISMISS, MOTIONS TO STRIKE, AND MOTIONS *IN LIMINE*

On Sunday morning, September 24, 2023, Rui Jiang attempted to shoot and kill religious congregants worshipping at Park Valley Church in Haymarket, Virginia. In his own words, he was there to "deny the men the life God actively puts so much effort to deny me every day." He had a loaded 9-millimeter semi-automatic handgun on his hip, a second loaded magazine in his pocket, and two knives. In his car, he had a third loaded magazine, a box of more ammunition, two more knives, and two kinds of chemical-irritant spray (including bear spray). A woman in Maryland, however, saw Jiang's earlier online threats against the church and called the police. And the church's private security noticed Jiang's concerning behavior that morning and confronted him. Jiang's plan was thwarted.

He is charged with multiple counts and detained pending trial on June 24, 2024. Jiang has now moved to dismiss various charges, strike certain aspects of the indictment, and preclude the admission of certain evidence at trial. All of his motions should be denied.

### Procedural Background

On February 23, 2024, Jiang was charged by federal complaint with transmitting threats of injury against another in interstate commerce, in violation of 18 U.S.C. § 875(c). And on March 27, a grand jury sitting in the Eastern District of Virginia issued a federal indictment

charging Jiang with three counts: (1) attempted obstruction of free exercise of religious beliefs, in violation of 18 U.S.C. § 247(a)(2), (d)(1), and (d)(3) (Count One); (2) use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and (3) transmitting in interstate and foreign commerce a threat to injure the person of another, in violation of 18 U.S.C. § 875(c) (Count Three). The indictment also includes a notice of special findings, notably that: (1) Jiang intentionally selected the victims of Count One because of their actual and perceived religious beliefs, and (2) Jiang intentionally selected the victims of Count Three because of their actual and perceived religious beliefs.

## Factual Background

In early 2023, Jiang became a member of Park Valley Church (the "Church") and was eventually baptized. By June, he took part in a tithing campaign that the Church offered to all its congregants. As Jiang saw it, his life began to deteriorate after he made his first donation. He became convinced that the Christian God was punishing him and decided to take his revenge against the congregants. The 36 hours leading up to the morning of September 24, 2023, make it clear that Rui Jiang was going to commit a mass shooting at Park Valley Church.

At 1:17AM on Friday, September 22, Jiang emailed one of the Church's pastors with the subject, "Please remove my membership," adding, "i am done with this bullshit. you made me your enemy. i gave your my heart, even after all you did to me. fuck all of you."[1] At 1:24AM, Jiang accessed his Gmail account and reviewed an email receipt documenting his June 16 donation to the Church of $452.75. Soon after, Jiang emailed the Church demanding a refund of his donation, stating, "I had started a recurring donation of at least 10% of each paycheck.

---

[1] The government intends to present to the Court and jury the defendant's statements verbatim, including all spelling and punctuation errors.

However, despite my relentless loyalty even in the worst of times, my life has only gotten WORSE." After listing alleged unfortunate events in his life, Jiang ended, "Interestingly enough, my life was generally better, before this year, and before I started tithing. I renounce my membership to the church and I DEMAND MY REFUND OF MY DONATION."

The next night, on September 23, Jiang sent himself a series of "notes to self" emails. At 2:52AM, Jiang emailed himself the following: "Do my actions affect my neighbors? Yeah? Well their very existence affects mine. That take up extra space by fucking the woman who could be fucking me instead. If they didn't exist, God wouldn't have them around to grant them the gift of sex over me. So fuck you and fuck my neighbors. If they complain I have a gun, I will shoot through my walls. Call the cops if you want. I have no sex life, thus, what have I got to lose?"

Jiang then turned to Instagram. Using the account name "Ray43386," Jiang posted at 3:27AM a picture of crumpled pages ripped out of a Bible along with a video of those pages on fire in a cooking pan on the stove top, adding the caption, "Burning the Bible #fkGod #hatredOfGod." Notably, Jiang "tagged"—or digitally linked his post to—the Church's own Instagram account. At 3:34AM, he posted a picture of the Bible itself, tagged the Church again, and wrote, "Put the Bible on the floor next to the bathroom. Now every time I take a piss, I have to step on it. #fkGod." In another note-to-self email, Jiang wrote at 4:04AM, "All these other men who you blessed with regular sex lives… They owe you everything. Sex is the ONLY benchmark and proof I use to measure your love for me or anyone. So I don't owe you shit. You lost me."

Forty minutes later, Jiang started messaging the Church again. At about 4:41AM, he attempted to send a text message to the main phone number affiliated with the Church, stating,

"Shut the fuck up." And, at 7:17AM, he sent an email to an address affiliated with the Church: "Fuck all of you. I hate you all. Refund my money now. You owe me."

By 10:58AM, on September 23, one of the senior pastors at the Church responded to Jiang offering to help him: "Dear Rui, I am so sorry for what you are going through. We will refund your money immediately. If there is anything else we can do we are available to help." Within 30 minutes, the senior pastor emailed Jiang again with an update, explaining, "Just got off the phone with our financial director. All of your money will be refunded back to your credit card on Monday. I anticipate that by Tuesday everything should be clear. I apologize for any inconvenience and know that we are here to help."

That evening, Jiang went to Sharp Shooters, a firearms store in Lorton, Virginia, and purchased 50 rounds of 9-millimeter ammunition. At about 6:52PM, Jiang used his cell phone to take a picture of a 9-millimeter, semi-automatic firearm, three magazines (one of which was loaded), a box of 9-millimeter ammunition, a firearm case, a holster, ear protection, and a firing target. Five minutes later, he returned to Instagram and posted a photograph of his gloved hand holding the 9-millimeter firearm pointed at his television screen depicting a church and the text "Beautiful Old Churches Across America." Jiang added a message: "When a loyal and humble servant becomes God's worst enemy. When we've had enough. When my loyalty was never appreciated."

Jiang then began a series of internet searches on a variety of topics revealing his intent to commit violence. At 7:12PM, he searched online for "Legal armor piercing rounds Virginia" and accessed a website related to "Widener's Guns, Ammo & Shooting Blog" about "Green Tip Ammo."[2] According to the same link accessible today—last updated on February 2021—"green

---

[2] https://www.wideners.com/blog/green-tip-ammo/

tip ammo" is a "popular 5.56 cartridge [that] is also sometimes referred to as a 'penetrator round' due to its 62-grain projectile, partially steel core, and enhanced ability to punch through hard targets." Within two minutes, Jiang then searched online for "Latest church shooting," and accessed a news link titled, "Newark Police Seek Public's Help in Pastor's Shooting," detailing an August 24, 2023, shooting in which "bullets tore through the wall" of a pastor's residence and left him in critical condition.[3]

Five minutes later, at 7:17PM Jiang searched online for "Assault rifle buying process virginia wait period." His search led him to a series of sites that detailed "States That Impose a Waiting Period for Purchases of All Guns and Firearms,"[4] "Gun laws in Virginia,"[5] and "How Long Does It Take to Buy an AR-15[6] in the United States?"[7] By 7:20PM, Jiang went to the website for "Sharp Shooters," the firearm and ammo store he had purchased 9-millimeter ammunition from earlier in the day. Using Sharp Shooter's "gallery of guns" search feature, Jiang proceeded to review over thirty pages' worth of the store's rifle models and then called Sharp Shooters and engaged in a phone call that lasted about one minute and fifty-five seconds.

Jiang then drafted another series of "notes to self" from 7:45PM to 7:56PM, writing in relevant part:

---

[3] www.msn.com/en-us/news/crime/newark-police-seek-publics-help-in-pastors-shooting/ar-AA1h9HBK

[4] worldpopulationreview.com/state-rankings/waiting-period-for-guns-by-state

[5] en.m.wikipedia.org/wiki/Gun_laws_in_Virginia

[6] The "AR-15" is a semi-automatic rifle that, according to the Washington Post and Northeastern University Mass Killings Database, has been used in at least 10 of the 17 deadliest mass shootings in the United States since 2012. *See* washingtonpost.com/opinions/2023/03/28/ar-15-assault-rifles-magazines-ban/.

[7] snopes.com/news/2018/02/22/how-long-to-buy-ar-15/

I am here to target men, and to deny them further the joys of a sexually active life that God blesses them with—the sex that God denied me. . . .

Their deaths are blood on your hands. I am not here to kill women. Apologies in advance if women are killed as collateral damage. I am only targeting men, particularly men who are around enjoying life as part of a couple. It is highly advised that to not become a target, do not walk hand in and [*sic*] with their girlfriend or sexual partner—at least 6 feet distance.

Any man who looks obviously lonely or probably haven't had sex in years—I will spare. But then again, in the heat of shooting, I might kill them anyways. Blood is on your hands. Not mine.

Those lonely men who haven't had sex in years—I will be doing them a favor by killing them out of their misery. They will be begging to die anyways. Those men who are lucky enough to be gifted by God to be sexually active—I can't wait to watch them beg for one last kiss with their partner before I leave them to bleed from their bullet holes.

Fuck you God. You did not allow me, yet another weekend, to have sexual activity. So I will deny your other servants their weekends.

I HATE YOU.

Immediately after sending these notes to self, Jiang searched online for "what medication minimizing effects of bullet wound." His search led him to a site titled, "How to Handle a Gunshot Wound—First Aid and Recovery for Bullet Wounds," that details "what to do and how to handle gunshot wounds in different parts of the body."[8] He continued researching how to address bullet wounds at 8:00PM, searching "Ibuprofen and bullet wounds will it increase bleeding" online and accessing a Reuters article titled, "Some painkillers have more bleeding risk than others."

---

[8] verywellhealth.com/how-to-treat-a-gunshot-wound-1298915

By 8:03PM, Jiang turned his focus to silencers.[9] He searched online for "silencers legal virginia," "silence are buying process wait period Virginia," and then accessed a site titled, "How Long Does It Take To Get A Suppressor 2024." Soon after researching silencers, Jiang accessed the Park Valley Church "Employee Directory" and began researching specific pastors at the Church, reviewing their name, church email address, social media activity, and past sermons online.

At 8:31PM, Jiang began searching online for all historical events that had occurred on September 24. Based on the data on Jiang's mobile device, he did not view many historical events related to September 24.[10]

Within 10 minutes, Jiang began searching online for "haymarket va police radio" and, indeed, accessed the Google Play Store and searched for "Police Radio" applications. At around 8:50PM, he explored various cyber-attack methods to shut down 911 dispatch services. Specifically, he searched online for "automated service call 911 bots," and accessed a series of

---

[9] Under 18 U.S.C. § 921(a)(25), the terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm. In other words, silencers are devices that help to conceal, either by sound or flash suppression, the fact that one is firing a firearm.

[10] According to one study focused on quantitative insights into the behaviors of mass shooters published by the National Academy of Sciences, "[i]n the context of mass shootings, fame-seeking mass shooters may tend to diversify their attacks from history to maximize the attention they could draw and leave a larger historical footprint." The results of the study in fact demonstrated that "these individuals carefully plan their attacks to be different from past shooters and that the tendency to deviate from history is, in fact, rewarded by fame." *See* Succar, R., Ventura, R., Belykh, M., Wei, S., & Porfiri, M., "Fame through surprise: How fame-seeking mass shooters diversify their attacks," in *Psychological and Cognitive Sciences, PNAS* 120, 1-10 (2023).

sites titled, "Auto911: Let's Automate 240 Million 911 Queries using AI,"[11] "Hackers Can Disrupt 911 Services With Small Smartphone Botnet,"[12] and "Researchers warn that hackers can DDos 911 emergency phone service."[13] The last site, last updated in September 2016, explained that "a telephony denial (TDoS) attack, launched by a mobile phone botnet, could cripple America's 911 call system." Immediately, Jiang then searched online for "tdos attack services dark web" and accessed sites titled, "What Is a Telephony Denial of Service (TDoS) Attack?"[14] and "Hacking The TDoS Attack,"[15] and "Dark Web Stories: DDoS as a Service—The Story Behind the Dark Web DDoS Attack Service."[16] The first site, last updated in October 2022, explained, "Telephony Denial of Service (TDoS) attacks have one aim: to overwhelm a service with so much traffic that the system buckles under the strain. This type of cyberattack is especially concerning because it is isolating and puts victims' lives at risk. . . . The impact for an individual is being unable to call emergency services."

By 9:05PM, Jiang returned his focus to purchasing an AR-15 rifle. He first searched online for "Does dicks sell ar 15 rifles," and then accessed "Aardwolf Solutions," which appears to specialize in facilitating online firearms purchases and transfers. After reviewing a few specific firearms models, including handguns and rifles, Jiang ceased his internet activity.

---

[11] towardsdatascience.com/auto911-lets-automate-240-million-911-queries-using-ai-b4e92010a68e?gi=61f51c4697fe

[12] securityweek.com/hackers-can-disrupt-911-services-small-smartphone-botnet/

[13] computerworld.com/article/3118703/researchers-warn-that-hackers-can-ddos-911-emergency-phone-service.html

[14] makeuseof.com/what-is-telephony-denial-of-service/

[15] www.darkreading.com/attacks-breaches/hacking-the-tdos-attack

[16] socradar.io/dark-web-stories-ddos-as-a-service/

But he did not go to sleep. In the 2 to 4AM hours, Jiang traveled to Park Valley Church with his car's dash camera recording him casing the Church's property. At the Church, Jiang remained on the property for nearly one hour: he repeatedly drove around the parking lot, pulled up to and stopped at the Church's front doors, pulled around to and stopped at the Church's side and back doors, circled around the Church's children center, and parked in numerous spots facing each of the building's exits and the parking lot exits from various vantage points. At certain spots throughout the Church property, Jiang appears to have stopped the car and walked around the outside area in the rain. Throughout his over-30-minute drive to the Church, time at the Church, and drive back home, Jiang smoked cigars and primarily played one song on repeat: Linkin Park's "Points of Authority." Some of the lyrics of the song include, "You love the way I look at you; While taking pleasure in the awful things you put me through; You take away if I give in; My life, my pride is broken" and "You like to think you're never wrong; You have to act like you're someone; You want someone to hurt like you; You wanna share what you've been through."

While at the Church and after returning home, Jiang posted a series of photographs of different parts of the Church's entrances and exits and firearm-related material along with threats against the church and its congregants on Instagram:

- At 2:45AM, Jiang posted a picture he took that morning through his rain-soaked windshield of the front façade of the Church and messaged, in relevant part, "Blood will be on your hands."

- At 2:48AM, Jiang posted a picture of part of the Church's parking lot and added, in relevant part, "I'm not going to let you enjoy your symbolic fuckery. When it all goes down: #bulletToTheHead blood is on your hands."

- At 2:52AM, Jiang posted another picture taken through his windshield of the Church's front entrance (this time from a different vantage point) and wrote, in relevant part, "I am here to deny the men the life God actively puts so much effort to deny me every day. No women will be harmed. To those down below: I am dropping this space suit and coming back after I am finished sending a message. Blood will be on your hands. This is how you repay me for my sacrifices. I'm done."

- At 2:59AM, Jiang posted a picture of the back entrance to the Church with the message, "Welcome to park valley church, attended by many top secret gov clearance holders in the area. From this day forward, you will know that this is how you all repaid me. Blood will be on your hands."

- At 3:20AM, Jiang posted another photograph of the Church parking lot, writing, in relevant part, "This is not personal. This is taking the lives that God denied me, the love that God blessed other men with. You are indebted to me. And this is how you repay me."

- At 3:26AM, Jiang posted another picture near one of the Church's parking lot exits and added in relevant part, "You denied me the love life you allowed others to have. I sacrificed my ENTIRE LIFE serving your bull shit."

- At 4:42AM, Jiang posted a picture of firearm target (that matches the target depicted in his earlier photograph he took at his residence) with at least seven bullet holes in it along with a message, stating, "I'm going to exterminate you, in this life and the next. For what you did to me, and for what you actively deny me. So you better neutralize me when I respawn, bitch."

- Finally, at 5:14AM, Jiang posted a picture of his hand pointing a semi-automatic handgun at a wall, messaging, "I sacrificed my entire 20s. Alone. As your pollical assassin. Never saw family. Never knew what it was to be in love. It was all I ever wanted. And this is how the government repays me. With torture. With pain. You brought this in yourselves. Blood will be on your hands. The world will know my story. And what you did to me. And why Im about to do what I do."

Upon returning home from the Church, Jiang spent nearly an hour drafting what he entitled "the final letter (Sept 24, 2023)." In relevant part, Jiang wrote the following:

SEPTEMBER 24, 2023

My name is Rui Jiang. I was born [redacted] in [redacted], MD. . . .

When I lived the life of a homeless man on the streets, so that it was not seen as a lie, so that my actions would not connect back to my employer – who paid me nothing. Who else, but the most loyal and humble of servants, would subject themselves to such sacrifices, all in the name of duty? What else do I have left to prove? When I returned, I did not ask for the life of a rich or wealthy man.

All I expected, was a normal and modest life, with a loving relationship and a routine sex life, just like the rest of you – luxuries you all enjoy every single day and perhaps even take for granted. But even after all my sacrifices, even this was denied to me. Despite my continued sacrifices in the name of duty, my quiet donations to churches, God's community, praying on my knees every morning at 5am for an hour, thanking God in Jesus' name, despite my faith even in my worst of days – nothing has changed. My mental health continues to deteriorate. I am not allowed to be in love. To experience love. To experience a romantic relationship. The Government routinely sends female operatives into my life, not with love or sex or any intimacy, but strictly to test me continuously on whether I spill any secrets, all in the name of duty. After all I put in, I have learned that the Government WILL NOT take care of its most loyal and relentlessly committed operatives. Our sacrifices teach us to always be selfish. Do NOT do your duty. Do NOT sacrifice. It is NOT worth it. My loyalties – our loyalties – are not appreCIAted here.

What I am about to do, is not personal. It is not politically motivated (I am off-duty now). It is not religiously motivated. These people – soon to be victims – were not targeted in advance. I did not, and perhaps will never know, their names, their faces, their families, and what will become of the luxury of their romantic relationships I am pulling them out of.

NO WOMEN WILL BE HARMED. I love and adore women. Without them, we become lunatics. So I apologize in advance, if any women are harmed, for that is deeply regrettable and collateral damage. I am here deny the love lives blessed by God to these lucky men, by taking out these men. And for those of you who believe in "past lives", I am simply resetting them so that they have to re-do everything again. I want them to know what it's like to be me – to labor through life yearning for that romantic love and never obtaining it, because God and the Government works so hard every day to sabotage the love lives for a select few, like me. To the families of those men about to be slain – I am sorry for what I have done and about to do. May your tears not be cried in vain, but celebrate how your loved ones had lived. For they are now with me, in the other world down below and high Heaven, and we will rise again just as we did in this life time. And perhaps, they shall return to find you again, just as I will, in the next lifetime. I hope you do not take this personally on me either. For whatever pain I cause, I hope to return in my next lifetime through philanthropy.

And to those few women who reciprocated my love, even for a few days: Thank you for those moments we shared, from the bottom of my heart. You know who you are. You prevented this from happening much sooner. I will repay you in my next life.

Until the next lifetime,

Rui

Jiang then posted a picture of part of this letter on Instagram at 6:03AM, copying the final paragraph as a caption. He ultimately printed five copies of this letter, signed all five in wet ink, and left them on his apartment countertop.

Then Jiang returned to Park Valley Church. Before departing his apartment, he fired off one last email with just a subject line to one of the Church's pastors: "The what, the why: May your tears be not in vain, but to celebrate their lives." The data on his cell phone reveals that he downloaded and used a police scanner application that morning titled, "Scanner Radio," and his dashcam footage from inside his vehicle reveals that he was listening to the radio when he departed for the Church. Specifically, a portion of audio captured by the dashcam footage reveals that he was tuned into the Prince William County Police Department radio, as evidenced by the particular unit number and address that went across the radio at the time Jiang was listening. The Church is in Prince William County. As he pulled out of his apartment complex, Jiang began

repeatedly playing the same Linkin Park song he chose as his soundtrack just hours earlier when he cased the Church in the middle of the night.

Jiang arrived at the Church in the 10:00AM hour, as the congregants were arriving and the Church was still filling up for one of the morning's services. So Jiang approached the Church. He was armed with a loaded 9-millimeter semi-automatic handgun, a second loaded magazine in his pocket, and two knives on his person. In his car, he left another loaded magazine, a box of 26 more rounds of ammunition, two more knives, and two bottles of chemical-irritant spray.

Rather than enter the Church through the front, Jiang entered through the rear entrance, dressed in his black leather jacket and dark-colored aviator sunglasses. He first attempted to use a staircase intended only for those dropping off their children at children services. When private security turned him away from that entrance, Jiang moved toward the front of the Church lobby where other congregants were milling about waiting for the next service to begin. Jiang entered the Church auditorium and sat in a rear seat before appearing to attempt to enter a door clearly marked for authorized personnel only. Jiang then retreated to the front of the Church where he entered the restroom and coffee area, filling a cup of coffee and pouring it out in the trash. Jiang then approached the Church's front doors made of glass, appeared to look up at the surveillance cameras, and began tapping on the glass wall. All the while, the Church's private security had been observing Jiang's odd activity and surveilling him. When Jiang began to tap on the glass, one of the security team finally approached him and inquired about his actions and intentions. Jiang simply stated that he was at the Church in an attempt to "reconnect with God."

At that time, an off-duty Prince William County law enforcement officer present at the Church had received word that there was a potential threat to the Church, namely that a woman had reported Jiang's Instagram threats to the police. That officer found Jiang's vehicle parked

near a side parking lot exit without Jiang in it. The officer then entered the Church and confronted Jiang in the lobby, where he was surrounded by the Church's private security. Law enforcement discovered the weapons and other relevant evidence on Jiang's person, in his vehicle, and in his residence. Ultimately, Jiang was arrested.

**Defendant's Motions to Dismiss and Strike**

The defendant, Jiang, now moves to dismiss certain aspects of the indictment across five motions. First, he moves to dismiss Count One for duplicity, arguing that the indictment combines more than one offense by charging him with attempting to obstruct by force the free exercise of religious beliefs of Park Valley Church's "congregants." ECF 36. Second, he moves to strike the statutory aggravators charged in Count One, claiming they do not legally apply to the conduct alleged. ECF 37. Third, he moves to dismiss Count Two, stating that the attempt charge in Count One cannot legally serve as a predicate crime of violence under 18 U.S.C. § 924(c). ECF 38. Fourth, he moves to dismiss Count Two arguing that it is duplicitous. ECF 39. Fifth, and finally, he moves to strike the notice of special findings included in the indictment. ECF 40. All of these arguments fail.

## I. Count One Is Not Duplicitous As Charged (ECF 36)

The defendant has moved to dismiss Count One of the Indictment on duplicity grounds, alleging that the proper unit of prosecution for a charge under 18 U.S.C. § 247(a)(2) is one individual victim while Count One charges the collective congregants. ECF 36. While he frames the charging decision as "sleight of hand," ECF 36 at 2, the charging of Count One is entirely consistent with historical Justice Department practice. Yes, the Department has regularly prosecuted cases under § 247(a)(2) by charging one count per individual victim, but this has generally been in cases involving actual injury or immediate exposure to actual injury to those

persons, such as in *United States v. Roof*, 2:15-CR-00472, ECF 2 (D.S.C.); *United States v. Bowers*, 2:18-cr-292, ECF 10 (W.D. Pa.), and *United States v. Earnest*, 536 F. Supp. 3d 688 (S.D. Cal. 2021). Where, as here, the conduct generally affected a whole congregation, the Department has regularly charged in a manner similar to the approach in Count Two. *See United States v. Hari, et al.*, 0:18-cr-150, ECF 14 (D. Minn.) (alleging a single § 247(a)(2) count for obstruction of "members and other attendees of the Dar al Farook Islamic Center"); *United States v. Hernandez*, 6:19-cr-00042, ECF 14 (D. Or.) (alleging a single § 247(a)(2) count for obstruction of "persons at St. Mary Catholic Church"); *United States v. Pritchard*, 1:22-cr-00060, ECF 2 (E.D. Mo.) (alleging a single § 247(a)(2) count for obstruction of "parishioners of the Church of Jesus Christ of Latter-day Saints" for a fire that destroyed the parishioners' church, preventing them from worshipping).

So, although the individual victim is the proper unit of prosecution in a typical case, the defendant's motion should be denied because, here, the defendant is not prejudiced by any duplicity of Count One. Quite the opposite. The government's framing of Count One was designed to streamline the government's trial presentation and has the added benefits of protecting the defendant from even the appearance of overcharging, insulating him from successive prosecutions with different listed victims, and protecting him from the potentially extraordinary mandatory-minimum sentence and related sentencing guidelines calculation that would result if the government successfully prosecuted every provable § 247(a)(2) count with corresponding § 924(c) counts.

The key shortcoming in the defendant's argument lies in his assumption that duplicitous counts must be dismissed or the government must be forced to elect. That is not the case. The defendant correctly defines duplicity as the joining in a single count of two or more distinct or

separate offenses. But "[e]ven if a count is duplicitous, it is not to be dismissed unless it causes prejudice to the defendant." *United States v. Burfoot*, 899 F.3d 326, 337 (4th Cir. 2018) (internal quotations omitted); *see also United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009) ("[D]uplicitous charging is impermissible only if it prejudices defendant"); *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (A "defendant must demonstrate prejudice in order to invoke [the] duplicity doctrine because the doctrine is more than an exercise of mere formalism") (internal quotations omitted). Nowhere in his motion does the defendant explain what prejudice he suffers from the duplicitous structuring of Count One. That is unsurprising, considering that the duplicity of Count One *protects* him from prejudice.

Understanding the extent to which the duplicitous nature of Count One protects the defendant from prejudice requires exploring another inaccuracy in the defendant's argument. The defendant claims without citation that "the government must allege that the religious exercise of an individual was obstructed . . . and that the 'acts committed' in *that* offense . . . included an attempt to kill *that person*." ECF 36 at 2 (emphasis in original). The problem lies in the final assertion. Nothing in the statute requires the government to prove the offense included an attempt to kill the person whom a defendant stands accused of obstructing. The plain language of the statute reveals that the statutory aggravators in subsection (d) are chargeable where the act of obstruction or attempted obstruction implicates the aggravator, such as involving an attempt to kill any person for subsection (d)(1). 18 U.S.C. § 247(d)(1) ("If death results from acts committed in violation of this section . . .").

Beyond the statute's plain language, basic logic dooms the defendant's claim. If someone firebombed an empty house of worship in the middle of the night, the crime would be prosecutable under § 247(a)(2) and (d)(3) for obstructing the free exercise of religious beliefs by

depriving the parishioners their house of worship, as was the case in *Pritchard*, 1:22-cr-00060, ECF 2 (E.D. Mo.). If the bombing involved enough explosive force to kill a man walking by the church on his way to the convenience store, the plain language of the statute and Congress's intent in codifying these felony aggravators support charging the § 247(a)(2) with a (d)(1) death-resulting aggravator, even though that man's free exercise of his religious beliefs weas not obstructed. Indeed, an attempt to kill can be accomplished even where a defendant has not targeted a specific person and is not even aware of their presence. *See Bowers*, 2:18-cr-292, ECF 1358 at 12-20 (concluding, in the course of discussing a jury question, that a § 247(a)(2) offense with an attempt to kill can be accomplished even where a defendant has not seen the victim and is unaware of the victim's presence).

With this in mind, the prejudice to the defendant if the Court were to grant his motion to dismiss for duplicity is clear. According to Park Valley Church data, it had 2,601 worshippers attend its three services on September 24, 2023, not including dozens of clergy and staff who were also engaged in the free exercise of their religious beliefs. The government could have identified the more than 1,000 people present for the service that the defendant was at and the service immediately following and charged the defendant with over 1,000 counts of § 247(a)(2) (all with (d)(1) and (d)(3) aggravators), alleging the attempted obstruction of each individual victim's free exercise of their religious beliefs involving an attempt to kill any person. This is consistent with the evidence, which will establish beyond a reasonable doubt that the defendant arrived at the Church on September 24, 2023, with the intent to carry out a mass shooting of congregants and was intercepted by police and Church security while assessing the best place and moment to carry out his attack. Although the defendant was only equipped with 50 rounds of 9mm ammunition and several knives, his attempt to murder *some* of the congregants was an

attempt to obstruct *all* of the congregants who were worshipping at the service that was in progress (and everyone planning to attend the service afterward).[17]

Each of these § 247(a)(2) counts would have a unique element (the obstructed victim) and would constitute a unique crime of violence, and so each could be accompanied by a corresponding § 924(c) count. *See United States v. Khan*, 461 F.3d 477, 493 (4th Cir. 2006) (consecutive § 924(c) sentences are permissible so long as the underlying crimes of violence are not duplicative under the Supreme Court's *Blockburger* double jeopardy analysis). Under a non-duplicitous charging strategy, the defendant would face a mandatory minimum of 100 years in prison if the government simply selected 20 congregants as victims for 20 counts of § 247 and corresponding counts of § 924(c).[18]

Nowhere is this risk clearer than in *Earnest*, 536 F. Supp. 3d 688 (S.D. Cal. 2021), the lead § 247(a)(2) case the defendant ironically relies on in advancing his duplicity argument. On April 27, 2019, Earnest attacked the Chabad of Poway Synagogue in Poway, California. He shot four people (one of them fatally) before his rifle malfunctioned and he fled. Earnest was prosecuted on one death-resulting § 247(a)(2) count for the victim he killed; three counts of 247(a)(2) involving attempt to kill, bodily injury, and a dangerous weapon for the three victims he wounded; and fifty counts of § 247(a)(2) involving attempt to kill and a dangerous weapon for

---

[17] Notably, factual impossibility is not a defense in an attempt case. *United States v. Hamrick*, 43 F.3d 877, 885 (4th Cir. 1995).

[18] To the extent the defendant may be seeking to take advantage of uncertainty surrounding which specific service he intended to attack—the one he attended or the service that started immediately after—his tactic is misplaced. The government could focus its charging on congregants who attended the latter, who assuredly would have been obstructed had the defendant attempted to murder congregants in either the later service or in the earlier service. Not to mention there were also people who were present for both services.

all the other congregants inside the synagogue at the time of his attack. *Id.*, ECF 17. Earnest was also charged with 4 counts of § 924(c)—one for the unlawful killing under § 924(c) and (j), and three for discharging his firearm. *Id.*

Yet nothing required the government to charge counts for all 54 victims of Earnest's attack in a single instrument. The ability to charge counts for select victims highlights another way in which the duplicitous construction of Count One protects the defendant and how he would be prejudiced if the Court were to grant his motion. Because each § 247(a)(2) count would require unique factual proof (the obstruction of the identified victim), double jeopardy would not protect the defendant from successive prosecutions of 20 counts of § 247(a)(2) for distinct victims and 20 corresponding counts of § 924(c). *See Blockburger v. United States*, 284 U.S. 299, 304 (1932); *United States v. Ball*, 18 F.4th 445, 450 (4th Cir. 2021). The government could uniquely charge and try this case over 100 times and the conviction on all counts in any one of those trials would result in a significant sentence for the defendant under the § 924(c) counts alone.

Because the defendant has failed to show any prejudice warranting dismissal of Count One and because he would only be prejudiced *by such dismissal* through his exposure to substantially more counts (including counts with consecutive mandatory minimum sentences) and successive prosecutions for the events of September 24, 2023, the motion to dismiss Count One for duplicity should be denied.

## II.  The Statutory Aggravators Charged in Count One Are Applicable (ECF 37)

The defendant also contends that § 247 precludes the application of certain aggravators under § 247(d) to attempted conduct and moves to strike them from the indictment. ECF 37. His argument suffers from a fundamental misreading of the statute and a faulty understanding of

attempt law.

The motion to strike appears to rest on the flawed premise that § 247(d)'s statutory aggravators must be acts themselves and that attempts to commit crimes do not amount to "acts." *See* ECF 37 at 2. This claim that § 247 aggravators must be based on "acts" appears to arise under the mistaken belief that § 247(d)'s use of "section" refers to § 247's *subsection* (d) as opposed to acts made criminal by § 247. Subsection (d) reads in relevant part:

> The punishment for a violation of subsection (a) or (c) of this section shall be—
> (1) if death results from acts committed in violation of this section or if such acts include . . . an attempt to kill, a fine in accordance with this title and imprisonment for any term of years or for life, or both, or may be sentenced to death . . . (3) if . . . such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, a fine in accordance with this title and imprisonment for not more than 20 years, or both . . .

18 U.S.C. § 247(d)(1), (3). The subsection could not be clearer, using "acts" to refer to the violation of the statute addressed in subsections (a)(1), (a)(2) (applicable here), and (c). The "acts" § 247(d) are referring to are not the acts enumerated in § 247(d) but are the acts of, *inter alia*, intentionally obstructing, by force or threat of force, any person in the enjoyment of that person's free exercise of religious beliefs, or attempting to do so. This reading, based on the plain and unambiguous structure of the statute, is supported by the Fourth Circuit's own reading of the statute. *See United States v. Roof*, 10 F.4th 314, 403 (4th Cir. 2021) (analyzing §247(d)(1) and noting that the death penalty is authorized if death results from acts committed in violation of § 247(a)(2)). The statutory aggravators are properly predicated on the defendant's alleged acts in violation of § 247(a)(2), accomplished via the defendant's attempt.

To the extent the defendant's motion is claiming that an attempted violation of § 247(a)(2) does not constitute an "act," this is flatly unsupported by caselaw and appears to be based on a misapprehension of what an attempt is. There is no federal attempt statute; instead, a

statute can only be charged under an attempt theory if the statute expressly authorizes it, as § 247(a)(2) does. *See United States v. Duroseau*, 26 F.4th 674, 680 (4th Cir. 2022). Nonetheless, the elements of an attempt are straightforward and the defendant correctly cites them, initially, in his motion—(1) that the defendant intended to commit a crime and (2) that the defendant took a substantial step strongly corroborating that intention. *See* ECF 37 at 8; *United States v. Haas*, 986 F.3d 467, 478 (4th Cir. 2021).

Following this initially correct definition, the defendant appears to minimize the substantial step element in service of a faulty argument that an attempt crime is not an "act." For example, the defendant erroneously claims that the "§ 247 aggravators are conduct-focused (triggered by "acts committed"), while the law of attempt . . . is intent-focused." *See* ECF 37 at 8. Later, he erroneously claims that the statutory aggravators are triggered by acts the defendant committed, "not the acts he intended." *Id.* at 10. Setting aside the obvious, that the charged statutory aggravators – an attempt to kill and an attempted use of a dangerous weapon – are attempts themselves, the law of attempt is not simply "intent-focused." It is equally if not more so about a *substantial step* corroborative of that intent. *Id.* It is not enough for a person to intend a crime, they must *act* on that intent through one or more substantial steps. It strains the definition of the word "act" to imagine it would not encompass conduct plainly covered by § 247's subsections (a) and (c) that constitutes a well-established criminal offense.

The jury instructions on attempt further illustrate this. The defendant is charged with a § 247(a)(2) offense: the attempted obstruction of the free exercise of religious beliefs. Again, this is the "act" referred to in § 247(d)(1) and (d)(3) that predicates the statutory aggravators. Attempt is, appropriately, a difficult crime to prove beyond a reasonable doubt, baking into the two elements of attempt all of the elements of the intended offense. The jury must be instructed not

just on the essential elements of an attempt, but also on the essential elements of this intended offense. 2 Fed. Jury Prac. & Instr. § 21:03 (6th ed.). Here, these essential elements include an attempt to kill and the attempted use of a dangerous weapon and are properly alleged in the indictment. *See Roof* at 402-03 (holding that § 247(d)'s aggravators are divisible elements of distinct offenses).

The defendant's contention that "[t]he government does not even allege that Mr. Jiang 'committed' the 'acts' that could trigger §§ 247(d)(1) and (d)(3)," ECF 37 at 3, is wholly inaccurate, again appearing to misread not only the law of attempt but the plain language of § 247(d). The "act" is the violation of § 247(a)(2), through an attempt, and this attempt to obstruct the free exercise of religious beliefs would only have been accomplished through an attempt to kill and the attempted use of the dangerous weapons the defendant armed himself with before entering the Church while in the midst of Sunday services. In short, consistent with the jury instruction on attempts, § 247 attempts have two acts—the act of attempt and the intended act that the defendant took a substantial step toward. The defendant is attempting to ignore the former in his effort to strike these appropriately charged statutory aggravators.

Because the plain and unambiguous text of § 247(d)(1) and (d)(3) make clear that they apply to the act of violating § 247(a)(2), and the act of violating § 247(a)(2) can be accomplished through attempt, which is a criminal act, the defendant's motion to dismiss the statutory aggravators charged in Count One should be denied. The question of whether the defendant attempted to obstruct the free exercise of religious beliefs and whether such conduct involved an attempt to kill and the attempted use of the defendant's dangerous weapons is a question properly charged and properly resolved by the fact finder at trial.

It is worth noting that the defendant's motion minimizes his detailed planning, arming, leaving of five signed copies of a suicide note explaining his murderous actions that was labeled his "Final Letter," his travel to the Church, and his monitoring of Prince William County Police radio frequencies while inside the Church. Clearly, this was a premeditated and carefully planned attempt to carry out a mass shooting at a house of worship because the defendant blamed God for his involuntary celibacy. Granting this motion would render Count One a misdemeanor and remove the predicate crime of violence for Count Two, requiring its dismissal. *See* 18 U.S.C. § 247(d)(5); ECF 38 at 1 n.1.

### III. Count One Is An Applicable Predicate Crime of Violence for Count Two (ECF 38)

In the defendant's motion to dismiss Count Two based on *United States v. Taylor*, he concedes that controlling Fourth Circuit authority compels the conclusion that offenses with an attempt to kill as an element remain crimes of violence. ECF 38 at 7. Accordingly, the government addresses this motion only to note its opposition to the motion and to clarify that the Fourth Circuit's decision in *Lassiter* did not "ignore[] *Taylor's* reasoning that attempt offenses do not qualify as crimes of violence" (*Id.*). The Supreme Court, in the text of the *Taylor* decision, reiterated *six times* that offenses that have as an element the attempted use of force qualify as crimes of violence. *United States v. Taylor*, 596 U.S. 845, 848, 50, 53, 58, 60 (2022).[19] The Fourth Circuit's ruling in *Lassiter* was firmly rooted in this *Taylor* jurisprudence and concluded the obvious: that attempted murder is an attempted use of force. *United States v. Lassiter*, 96

---

[19] The government also notes that the defendant's discussion of the Fourth Circuit's ruling in *Roof*, found in footnote 3 of their motion, is not quite accurate. The defendant claims that *Roof* was decided "pre-*Taylor*" but neglects to mention that in *Roof* the Fourth Circuit applied their own reasoning in *United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020), reasoning that was later affirmed by the Supreme Court. *See United States v. Roof*, 10 F.4th 314, 404 (4th Cir. 2021); *United States v. Taylor*, 596 U.S. 845, 848, 860 (2022).

F.4th 629, 633 (4th Cir. 2024); *see also United States v. Hunt*, — F.4th —, 2024 WL 1626301 at *5-6 (4th Cir. Apr. 16, 2024) (extending *Lassiter* and noting that "if the phrase 'attempted use of force' refers only to acts such as discharging a firearm, smashing a window, or swinging a knife, most—maybe all—attempt offenses would not be crimes of violence. That cannot be what Congress intended.").

The defendant's motion to dismiss Count Two properly preserves the issue for any appeal but should be denied based on controlling Supreme Court authority in *Taylor* and Fourth Circuit authority in *Lassiter* and *Hunt*.

## IV. Count Two Is Not Duplicitous As Charged And, Regardless, Presents No Prejudice (ECF 39)

The defendant's arguments regarding Count Two's duplicity should meet the same fate. Count Two charges the defendant with violating 18 U.S.C. § 924(c). Section 924(c) states in relevant part: "[A]ny person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" shall be subject to certain minimum sentences. 18 U.S.C. § 924(c)(1)(A). Here, Count Two charges the defendant with both knowingly using and carrying a firearm during and in relation to a crime of violence and knowingly possessing that firearm in furtherance of this crime of violence. The defendant claims that, as charged, Count Two is duplicitous because it charges two separate *offenses*. ECF 39 at 1. Not so. Both prongs of § 924(c) delineate separate *means* by which the defendant can commit the crime, not separate crimes themselves. And, regardless, the government appropriately charged the disjunctive statute conjunctively, and the jury instructions and verdict form can be crafted in a way to mitigate any duplicity concerns.

### A. *Section 924(c) describes different means of committing a single offense*

"An indictment is duplicitous if it charges two offenses in one count, creating 'the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count.'" *United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017) (quoting *United States v. Robinson*, 627 F.3d 941, 957 (4th Cir. 2010)). "Such a jury would not unanimously agree on the offense that the defendant committed, violating the defendant's Sixth Amendment right to a unanimous verdict." *Id.* (citation omitted). "A single offense that can be committed by alternative means, however, is not necessarily duplicitous." *United States v. Shapat Ahdawan Nabaya*, No. 3:17CR3, 2017 WL 1424802, at *12 (E.D. Va. Apr. 19, 2017) (citing Fed. R. Crim. P. 7(c)).

"When faced with an alternatively phrased statute, '[t]he first task' is 'to determine whether its listed items are elements,' thus rendering the statute divisible, 'or means,' thus rendering it indivisible." *United States v. Allred*, 942 F.3d 641, 649 (4th Cir. 2019) (quoting *Mathis v. United States*, 579 U.S. 500, 517 (2016)). To date, the Fourth Circuit has not ruled on whether the separate clauses of § 924(c) are elements or means. The Circuit has, however, reviewed the issue under plain error review and has consistently denied each defendant's argument, often finding no error at all and highlighting reasons why charging § 924(c) in the conjunctive is appropriate. In *United States v. Sarvis*, the court denied the defendant's argument, adding, "We discern *no error*, much less plain error, in the indictment." 601 F. App'x 176, 179 (4th Cir. 2015) (emphasis added). Rejecting the defendant's argument that the use of the conjunctive, rather than the disjunctive, in the indictment warranted dismissal, the court explained, "'where a statute is worded in the disjunctive, federal pleading *requires* the Government to charge in the conjunctive.'" *Id.* (citing *United States v. Montgomery*, 262 F.3d

233, 242 (4th Cir. 2001)) (emphasis added). The Circuit reached the same conclusion as recently as 2022 in *United States v. Banks*, stating, "[t]here is a real question about whether [the § 924(c) count] was duplicitous at all. Two or more acts, each of which would constitute an offense standing alone may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme. And in that situation, the Sixth Amendment is not violated." 29 F.4th 168, 181 (4th Cir. 2022) (cleaned up) (citing *Burfoot*, 899 F.3d at 337). At the very least, the Circuit has been clear: "the number of offenses in § 924(c) is unsettled" in this jurisdiction. *Id.* (citing *Robinson*, 627 F.3d at 957 n.4); *see also United States v. Mingo*, 237 F. App'x 860, 864-65 (4th Cir. 2007) ("We have not yet decided, as have other courts, whether § 924(c) defines two distinct offenses.") (citations omitted).

In light of this landscape, the defendant turns to a non-binding district court decision in *United States v. Pleasant*, 125 F. Supp. 173 (E.D. Va. 2000). Lacking guidance from the Fourth Circuit "respecting how to structure the examination of the statute as an alternative means enactment," the court in *Pleasant* turned to other jurisdictions, including the Ninth Circuit in *United States v. UCO Oil*, 546 F.2d 833, 835-37 (9th Cir. 1976), to determine that the relevant considerations are: (1) the text of the statute, (2) the legislative history, (3) the proof necessary to support each offense or means, and (4) the nature of the proscribed conduct. The *Pleasant* court ultimately ruled that these factors reveal that § 924(c) "delineates two quite different, albeit related, proscriptions" and "defines two different crimes." *Id.* at 176 n.2.

In 2006, however, the Ninth Circuit itself explicitly disagreed with the *Pleasant* court's decision, employing the same *UCO Oil* test to conclude that "it is clear that § 924(c) creates only one offense." *United States v. Arreola*, 467 F.3d 1153, 1157 (9th Cir. 2006). Four features of the statute confirm that the Ninth Circuit's conclusion is correct.

*1. Statutory Text*

First, "the statute on its face [] resolve[s] the issue." *Mathis*, 579 U.S. at 518. The statute sets forth the prohibited conduct in a single sentence, applying to a person who, "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c). Of course, "Congress could have chosen in enacting the statute to create separate sub-parts, which would have presented a stronger argument that it creates separate offenses, but it did not. Rather Congress placed both the 'uses or carries' provision and the 'possesses' provision in the same sentence." *Arreola*, 467 F.3d at 1157. Notably, the Fourth Circuit also highlighted that grammatical feature of § 924(c) within a year of the *Pleasant* decision, noting, "Congress set the first paragraph . . . apart from the three subsections below, indicating that this first paragraph contains the elements of the crime—using or carrying in relation to or possessing a firearm in furtherance of drug trafficking—while the subsections list sentencing factors." *United States v. Harris*, 243 F.3d 806, 810 (4th Cir. 2001).

The punishments associated with a violation of § 924(c), in fact, also support the conclusion that § 924(c) proscribes one offense by multiple means. "If statutory alternatives carry different punishments, then under *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000),] they must be elements." *Mathis*, 579 U.S. at 518. But here, "the punishments . . . do not vary according to whether the defendant violated § 924(c) by 'using or carrying' or by 'possessing.' Rather, the punishments vary according to whether the defendant 'brandished' or 'discharged' a firearm, where brandishing and discharging are set out, as sentencing factors, in *separate* subsections." *Arreola*, 467 F.3d at 1157-58. Therefore, while it is clear "as the courts held in *Pleasant*" and elsewhere, that § 924(c) names two distinct acts, it does not create two separate

offenses. "Rather, it identifies two ways in which a defendant could violate § 924(c)." *Id.* at 1158

(citing *United States v. Street*, 66 F.3d 969, 974 (8th Cir. 1995) ("The statute lists all of the acts

of violation in one sentence, and imposes a single penalty for all of them, a construction which

indicates that Congress did not mean to create more than one offense.")).

### 2. Legislative History

Second, the legislative history "tends to suggest that Congress intended to create a single

offense." *Id.* Before 1998, § 924(c) proscribed using or carrying, but not possessing, a firearm in

certain scenarios. *See* 18 U.S.C. § 924 (1997). Then, the Supreme Court in *Bailey v. United

States* held that the "uses or carries" provision of § 924(c) did not encompass mere possession.

516 U.S. 137, 143 (1995) (requiring the government "to show an active employment of the

firearm by the defendant, a use that makes the firearm an operative factor in relation to the

predicate offense"). "Following the issuance of the *Bailey* opinion there was a sharp drop off in

the number of prosecutions under the statute." *United States v. Latham*, 903 F. Supp. 2d 354, 357

(E.D.N.C. 2012) (citing H.R. Rep. No. 105-344, at *6 (1997)). So, in 1998, Congress amended

§ 924(c). "According to the House Committee notes, the amendment was intended to "reverse

the restrictive effect of the *Bailey* decision." *Id.* (cleaned up).

"In the first draft of Senate Bill 191, the Senate proposed to add the term 'possesses' to

the existing version of § 924 so that it read, 'any person who, during and in relation to any …

drug trafficking crime ..., uses, carries, or possesses a firearm.'" *Arreola*, 467 F.3d at 1159

(citing S. 191 Version One, 105th Cong. (1997)). "In its bill, H.R. 424 Version 1, 105th Cong.

(1997), the House proposed to replace the phrase 'uses or carries' with 'possesses' because '[t]he

word *possession* has a broader meaning than either *uses* or *carries*, thus reversing the restrictive

effect of the *Bailey* decision.'" *Id.* (quoting H.R. Rep. No. 105–344, at *6 (1997)).

"In a second draft, the House bill named three distinct firearms offenses, each in different subsections"—covering one who "possesses a firearm in furtherance of the crime," "brandishes a firearm," and "discharges a firearm." *Id*. (citing H.R. 424 Version 2, 105th Cong. (1997)). "The Report of the House Committee on the Judiciary explained that it modified 'possesses' with 'in furtherance of the crime' even though 'the distinction between 'in furtherance of' and 'during and in relation to' is a subtle one, and may initially prove troublesome for prosecutors. Nevertheless, the Committee believed that 'in furtherance of' is a slightly higher standard, and encompasses the 'during and relation to' language." *Id*. (citing H.R. Rep. No. 105–344, at *11– 12). In the statute as enacted, "the amendment to § 924(c) retained the 'uses or carries' provision separately from the 'possesses' provision, and attached the more stringent 'in furtherance of' requirement to possession." *Id*.

The defendant claims that this separate provision evidences Congress's intent to codify a separate offense. "On the contrary, it appears that Congress structured § 924(c) as it did to assuage the fear of some members of Congress and 'assure that someone who possesses a gun that has nothing to do with the crime does not fall under 924(c).'" *Id*. (quoting 144 Cong. Rec. S12670 (statement of Sen. De Wine); 144 Cong. Rec. H532 (daily ed. Feb. 24, 1998, statement of Rep. Waters) ("If a young man 19 or 20 years old maybe goes out to hunt and they have got a hunting rifle and they happen to have 5 ounces of crack cocaine inside their jacket pocket, they have a gun, ..., they are in possession of drugs, first-time offense on the possession of the cocaine, 5 years minimum in Federal prison added to this with a gun, the hunting gun, now 15 years. Is that what the gentleman understands this bill to be?"); *id*. at H534 (statement of Rep. McCollum) ("If indeed the person possesses a gun, the simple possession of it during the course of while that is going on, if it is not in furtherance of that crime, it is not going to trigger the

additional mandatory minimum. And it is not a gray area at all."). "Moreover, the fact that Congress chose *not* to adopt the House bill—which explicitly prescribed separate offenses— suggests that Congress did not intend to separate § 924(c) into multiple offenses." *Id.* (emphasis added).

### 3. Nature of Necessary Proof

Third, the nature of the necessary proof is so similar in nature as to suggest that § 924(c) proscribes only one offense. *See id.* at 1159-60. A statute may create separate offenses where the behavior underlying the alternative phrases "differs [] significantly." *Allred*, 942 F.3d at 650. But, where "the proscribed acts 'merge into each other, blurring any conceptual distinctions,' it is less likely that the statute creates separate offenses." *Id.* (quoting *UCO Oil*, 546 F.2d at 837). As to the first clause of § 924(c), the government must prove a defendant used or carried a firearm during and in relation to a predicate crime. Specifically, that the defendant engaged in "an *active employment* of the firearm"—a "use that makes the firearm an operative factor in relation to the predicate offense." *Bailey*, 516 U.S. at 143. And, as to the second clause, the government must prove that the defendant possessed a firearm in furtherance of a predicate crime. Specifically, that the "possession of a firearm furthered, advanced, or helped forward a [predicate] crime." *United States v. Smith*, Case No. 23-4085, 2024 WL 1795142, at *2 (4th Cir. Apr. 25, 2024) (citing *United States v. Howard*, 773 F.3d 519, 527 (4th Cir. 2014)).

"The two types of conduct that § 924(c) proscribes are difficult to distinguish conceptually." *Arreola*, 467 F.3d at 1160. The actions of "using or carrying" overlap with "possessing," and the intent to "carry in relation to" or "possess in furtherance of" require similar proof. "As the House Report acknowledged, 'the distinction between 'in furtherance of' and 'during and in relation to' is a subtle one, and may initially prove troublesome for prosecutors.'"

*Id.* (quoting 105 H.R. Rep. 105–344, at 12). Particularly in light of such similarity, the rule of lenity requires that "doubt [] be resolved against turning a single transaction into multiple offenses." *See United States v. Dunford*, 148 F.3d 385, 389-90 (4th Cir. 1998) (citing *Bell v. United States*, 349 U.S. 81, 84 (1955)).

### 4. Nature of the Proscribed Conduct

Fourth, and finally, the nature of the proscribed conduct and related punishment supports reading § 924(c) as defining multiple means and not multiple offenses. The Supreme Court in *Bell* "laid down a presumption against construing statutes so as to lead to multiple punishment." *UCO Oil*, 546 F.2d at 837 (citing *Bell*, 349 U.S. at 81). The defendant's interpretation, however, would lead to exactly that conclusion. As the Ninth Circuit cautioned in *Arreola*: "[I]t would seem absurd to permit multiple punishment of a defendant who violates both the 'uses or carries' clause and the 'possesses' clause." 467 F.3d at 1160. The defendant's case illustrates why. Under his interpretation, the government should have charged him with two counts of violating § 924(c)—one for carrying and using his firearm in relation to his attempted mass shooting at the Church, and one for possessing his firearm in furtherance of his attempted mass shooting.[20] While his sentences would ultimately be concurrent, he would still be being punished for one

---

[20] The government would not bring such an indictment given the Department of Justice's longstanding practice of "basing each Section 924(c) count in an indictment upon a separate predicate offense." Memorandum from James K. Robinson, Assistant Attorney General, to All United States Attorneys, First Assistant United States Attorneys, and Criminal Division Section Chiefs and Office Directors (Aug. 24, 1999). That practice reflects the consensus of a majority of courts of appeals that § 924(c)'s unit of prosecution is the predicate crime of violence or drug-trafficking crime. *See United States v. Anderson*, 59 F.3d 1323, 1328 (D.C. Cir. 1995) (en banc) (collecting cases); *but see United States v. Luskin*, 926 F.2d 372, 378 (4th Cir. 1991) (upholding multiple § 924(c) convictions predicated on the same crime of violence).

continuous act.[21] "The more logical conclusion is that Congress intended to widen the means of proving a single offense" after the Supreme Court narrowed the statute's application in *Bailey*. *Id*.

### B. Any duplicity in Count Two does not prejudice the defendant

Regardless, even if § 924(c) does proscribe multiple offenses, "[a] duplicitous count is not to be dismissed unless it causes prejudice to the defendant." *Shapat Ahdawan Nabaya*, 2017 WL 1424802, at *12 (quoting *United States v. Kamalu*, 298 F. App'x 251, 254 (4th Cir. 2008)). No prejudice would result to the defendant from any potential duplicity in Count Two as charged for at least two reasons. First, "[w]here the indictment 'fairly interpreted' alleges a 'continuing course of conduct, during a discrete period of time,' the indictment is not prejudicially duplicitous." *Id*. (quoting *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006)). "[T]wo or more acts, each of which would constitute an offense standing alone and which therefore could be charged as separate counts of an indictment, may instead be charged in a single count if those acts could be characterized as part of a single, continuing scheme." *Kamalu*, 298 F. App'x at 254 (citations omitted). Here, the defendant is alleged to have prepared to, and taken multiple steps to, obstruct the free exercise of religion at Park Valley Church with the use of a firearm on September 24, 2023. As alleged, none of the concerns related to duplicity are present: there is no

---

[21] In fact, that possibility is what has prevented defense counsel from raising duplicity issues in previous cases where the government charged § 924(c) in the conjunctive. *See, e.g.*, *Phun v. United States*, Case No. 1:10-CR-446, 2015 WL 5020886, at *4 (E.D. Va. Aug. 19, 2015) ("Petitioner's counsel has averred that he deliberately chose not to contest the indictment as duplicitous in light of the possibility that the government could return a superseding indictment charging Petitioner with not one, but two counts under § 924(c), which he believed could have prejudiced the jury against him.").

notice problem, no exposure to Double Jeopardy, and no prejudice regarding the breadth of admissible evidence.

The only remaining duplicity concern, and the only one the defendant raised in his motion, is the potential lack of jury unanimity in any conviction. This concern can be addressed by the jury instructions and special verdict form. "It is black letter law that duplicitous indictments can be cured through appropriate jury instructions." *Robinson*, 627 F.3d at 958 (citations omitted). The parties and Court can easily fashion jury instructions that make clear the correct elements and burden of proof for the government to prove the defendant was either "using or carrying a firearm in relation to" *or* "possessing a firearm in furtherance of" his attempted obstruction of religious beliefs *or* both.[22] Likewise, the parties and Court can fashion a special verdict form with options for the jury to check off *how* the jury found the defendant guilty of Count Two. Providing an option for both "using or carrying a firearm in relation to" or "possessing a firearm in furtherance of" the predicate crime in the event the jury finds the defendant guilty of Count Two will allow the jury to make clear they were unanimous in their decision. *See, e.g.*, *Phun v. United States*, Case No. 1:10-CR-446, 2015 WL 5020886, *4 (E.D. Va. Aug. 19, 2015) ("Even assuming that the statute creates two district [*sic*] offenses and Count Two was duplicitous as a result, Petitioner has suffered no prejudice because the special verdict form utilized in this case clearly demonstrates that the jury separately and unanimously convicted him of both the possession and the carrying prongs of § 924(c).").

_____

[22] Importantly, jury instructions that present the elements in the disjunctive as proposed would *not* amount to a constructive amendment of the indictment despite the indictment's use of the conjunctive in Count Two. "[W]hen the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive." *Robinson*, 627 F.3d at 958 (quoting *United States v. Perry*, 560 F.3d 246, 256 (4th Cir.2009)).

In sum, Count Two is not duplicitous as charged, as it presents separate means by which the defendant could, and did, violate § 924(c). Alternatively, any prejudice from duplicity concerns can be eliminated by the jury instructions and verdict form.

## V. The Special Findings Are Relevant And Not Prejudicial (ECF 40)

Finally, the defendant moves to strike as surplusage the special findings included in the indictment. But the special findings are relevant, proper, and non-prejudicial, so he fails to meet the standard for striking surplusage.

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). "Upon the defendant's motion, the court may strike surplusage from the indictment." *Id*. at 7(d). "The purpose of Rule 7(d) is to protect a defendant against prejudicial allegations that are neither relevant nor material to the charges made in an indictment, or not essential to the charge, or unnecessary, or inflammatory." *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (quoting *United States v. Poore*, 594 F.2d 39, 41 (4th Cir. 1979)). Thus, a "motion to strike surplusage from the indictment should be granted *only* if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Siegel*, 536 F.3d 306, 321 (4th Cir. 2008) (quoting *Williams*, 445 F.3d at 733) (emphasis added).

The defendant does not, and cannot, make that showing. As detailed above, the indictment includes special findings that the defendant chose his victims in Counts One (obstruction of others' free exercise of religion) and Three (interstate threats) based on their actual or perceived practiced religion. The defendant first bafflingly claims that religious hostility is irrelevant to charges involving the forceful obstruction of religious expression and interstate threats against the congregation of a church. Relatedly, his only alleged prejudice—that

evidence the defendant harbored religious hostility is "self-evidently inflammatory," ECF 40 at 1 & 9—ignores that this evidence and argument will likely be admissible regardless of the presence of the special findings in the indictment.

First, the notice of special findings in the indictment is relevant. The defendant erroneously implies that evidence is only relevant if it is direct evidence of an element of the charge. ECF 40 ("Neither of the two counts to which the special findings purportedly relate contain religious hostility as an element."). But Rule 401 of the Federal Rules of Evidence makes clear that the scope of relevant evidence is much broader than just the elements of an offense. Evidence is relevant if "it has *any* tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action." Fed. R. Evid. 401 (emphasis added). Evidence of motive, including religious hostility, certainly makes it more probable that the defendant intended to obstruct others' free exercise of religion and intended to transmit a true threat against the congregants of Park Valley Church. Put differently, that religious hostility is not a required element in Counts One or Three, as the defendant points out, says nothing about whether evidence of such hostility is relevant or admissible. The Fourth Circuit's decision in *Siegel* is instructive. There, the district court struck as surplusage in the indictment a "Charged Other Crime Evidence" section after excluding the evidence from trial. *Siegel*, 536 F.3d at 321. The Circuit disagreed. *Id*. After determining that the evidence would be admissible under Federal Rule of Evidence 404(b) as evidence of motive and *modus operandi*, *id*. at 318-19, and not excludable under Rule 403, *id*. at 319-20, the court concluded "there simply is no basis for striking the allegations of the Charged Other Crime Evidence from the indictment," *id*. at 321. The same is true here.

Second, and relatedly, the special findings are not prejudicial. The defendant's only articulated prejudice appears to be the alleged inflammatory nature of the special findings in the indictment. That argument misses the mark for multiple reasons. As a threshold matter, this argument assumes the jury will receive the indictment or ignore standard jury instructions in most criminal trials that inform jurors that indictments are not evidence. *Williams*, 445 F.3d at 734 ("[W]e fail to see how [the defendant] could have been prejudiced by the inclusion of those allegations in the indictment, particularly since the indictment was not given to the jury and the district court specifically instructed the jury that the indictment was not evidence."). Nor do the presence of these special findings artificially broaden the scope of admissible evidence. Indeed, evidence that the defendant harbored animosity toward the Christian God, Christianity, and particular members of "God's servants" can be found in message after message he wrote to himself and to others on social media in the days leading up to September 24. All of this will be relevant evidence of the defendant's motive and intent to commit the charged crimes regardless of whether the special findings are in the indictment or not. Finally, should he eventually stretch his prejudice argument to any special verdict form that lists these allegations for the trial jury to determine in the event it finds the defendant guilty of either Count One or Count Three, such a procedure is acceptable in the Fourth Circuit. *United States v. Udeozor*, 515 F.3d 260, 271 (4th Cir. 2008) ("[W]hile it is better practice to submit the general verdict and special verdict forms separately, the district judge, both in the formal jury instructions and in the verdict form, instructed the jury not to consider the three special findings unless it first found [the defendant] guilty. This procedure has been recognized as an acceptable one."). The defendant cannot show how the presence of special findings in the indictment creates any prejudice.

Lastly, the defendant claims the United States Sentencing Guidelines do not permit such special findings in an indictment. Unless the enhancement increases the statutory maximum, the thrust of the defendant's argument goes, special findings are forbidden. ECF 40 at 6. All of this ignores that these special findings are relevant and non-prejudicial to the defendant, which is the operative question. In any event, his claim is mistaken. Section 3A1.1(a) calls for a sentencing court to increase a defendant's offense level by three points "[i]f the finder of fact at trial . . . determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived . . . religion. . . of any person." U.S.S.G. § 3A1.1(a). While this enhancement does not increase the statutory maximum, the defendant's proposed bright line rule raises the question: how does the government ever satisfy Section 3A1.1(a)'s "special evidentiary requirements" when the case goes to trial if no special findings are allowed?

The defendant's extra-textual argument that the enhancement only applies to crimes with an element that meets the language of Section 3A1.1(a) is belied by the fact that throughout the Guidelines the Sentencing Commission evidenced its ability to tailor enhancements to specific statutes. *See, e.g.*, U.S.S.G. § 2H1.1(b)(1) Offenses Involving Individual Rights (limiting its application to "Statutory Provisions: 18 U.S.C. §§ 241, 242, 245(b), 246–250, 1091; 42 U.S.C. § 3631.intro.") & U.S.S.G. § 2J1.2 Obstruction of Justice (limiting its application to "Statutory Provisions: 18 U.S.C. §§ 1001 (when the statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism, or to sex offenses under 18 U.S.C. § 1591 or chapters 109A, 109B, 110, or 117 of title 18, United States Code), 1503, 1505–1513, 1516, 1519"). Presumably the Sentencing Commission could have provided a similar limited list of applicable statutory provisions under Section 3A1.1(a). It did

not. Instead, the Commission noted in the "Background" section, "Subsection (a) reflects the directive to the Commission, contained in section 280003 of the Violent Crime Control and Law Enforcement Act of 1994, to provide an enhancement of not less than three levels for an offense when *the finder of fact at trial* determines beyond a reasonable doubt that the defendant had a *hate crime motivation*." U.S.S.G. § 3A1.1(a) Comm. Bgd. (emphasis added). Notably, the Commission did not state that Congress's intent was to only apply such an enhancement when the defendant had a *hate crime conviction*. Surely a defendant can harbor a hate crime motivation when he attempts to forcibly obstruct the congregants at a church from freely exercising their religion by shooting them during a Sunday morning service.

Moreover, the Fourth Circuit has previously allowed special findings when the facts at issue were related to sentencing guidelines enhancements. "A jury may be asked to make special findings when, as here, the circumstances triggering enhanced punishment 'had to be pled in the indictment and the facts supporting those enhancements found by the jury beyond a reasonable doubt.'" *United States v. Briscoe*, No. 23-4013, 2024 WL 1864952, at *3 n.5 (4th Cir. Apr. 30, 2024). While the enhancements at issue in *Briscoe* adjusted the applicable statutory maximum, the Circuit does not state anywhere that the "enhanced punishment" warranting special findings is limited to that circumstance. In fact, the Circuit cited cases that allowed special findings dealing with more run-of-the-mill sentencing enhancements. *Id.* (citing *Udeozor*, 515 F.3d at 271; *United States v. Hedgepeth*, 434 F.3d 609, 613 (3d Cir. 2006) (noting that special findings may be necessary when a determination of certain facts will be crucial to the sentence)). To be sure, these cases stem from a period of uncertainty surrounding sentencing guidelines between the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), yet none of the decisions in affirming the use of special findings

regarding enhancements espoused the defendant's bright line rule or cautioned against the potential *ultra vires* application of the guidelines. ECF 40 at 5.

Ultimately, the defendant cannot make the proper showing to warrant striking the special findings in the indictment, and they should remain.

**Defendant's Motions *In Limine***

The defendant has also moved to preclude certain evidence from trial. Specifically, he moves to preclude as unfairly prejudicial all references to the term "manifesto" as it relates to his final letter dated September 24, 2023, that was discovered at his residence. Relatedly, he moves to preclude as irrelevant and prejudicial certain physical evidence seized from his vehicle and residence. Both of his arguments fall short.

## I. The Term "Manifesto" Is Appropriate and Not Unfairly Prejudicial (ECF 42)

As detailed above, law enforcement discovered multiple signed copies of what the defendant titled "The Final Letter," dated September 24, 2023, at his apartment. The government also discovered multiple drafts, including what appears to be a final draft, of the same letter in digital form on his electronic devices. Further, the defendant posted a picture of part of the letter on Instagram[23] and included a portion of it as a caption in the early morning hours of September 24.[24]

---

[23] The defendant's claim that "there is not enough information in the Instagram post to confirm that the documents are the same" is patently false. ECF 42 at 2 n.4. The Instagram photograph shows a portion of the end of the letter that matches the same text and wet-ink signature in the letter found at his residence. The caption in the Instagram post matches the final paragraph in both the letter and portion depicted in the Instagram photograph. And the metadata shows that Jiang made this particular post at 6:03AM, which is within the timeframe Jiang saved drafts of the letter as Word documents on his computer from 5:33AM to 6:12AM. The documents are the same.

[24] The defendant incorrectly claims that this motion will be moot if the Court grants his motion to suppress the letter seized from his residence. ECF 42 at 1 n.1. Regardless of the outcome of

The heart of the defendant's argument is that the term "manifesto" is not accurate and that the only apparent reason to use the term is "in the pejorative sense." ECF 42 at 3. Both points are wrong. Definitions of the term "manifesto" include: "a written statement declaring publicly the intentions, motives, or views of its issuer,"[25] and "a document publicly declaring the position or program of its issuer . . . [that] advances a set of ideas, opinions, or views, but [] can also lay out a plan of action."[26] The defendant's letter lays out his intentions, ideas, and motives for the violence, pain, and death he attempted to inflict on followers of the Christian God on September 24. As for the defendant's argument that his letter was not public, he not only posted part of the letter publicly on Instagram but also printed five copies of the letter, signed them, and left it in plain view in his residence in an obvious attempt to publicize it at least to law enforcement. While the term may have recently taken on a colloquial association with shootings, that argument goes to prejudice and less to the claim that the term is not factually accurate.

Further, the term "manifesto" is not just the government's word for the defendant's letter, it is a civilian witness's word. The woman who called 911 after observing the defendant's Instagram posts, including the post that excerpted a portion of the letter, referred to the letter as a "kill manifesto." That witness's interpretation of the defendant's letter is relevant and admissible as to the threatening nature of his social media post at the heart of Count Three and to the foundation for her decision to call the police. "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end."

the motion to suppress, the government intends to introduce evidence of the letter from the various other locations the government discovered it.

[25] *Merriam Webster¸* merriam-webster.com/dictionary/manifesto.

[26] *Brittanica*, britannica.com/topic/manifesto

*Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citing *Elonis v. United States*, 575 U.S. 723, 733 (2015)). Indeed, "[w]hen the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to 'fear of violence' and to the many kinds of 'disruption that fear engenders.'" *Id.* (quoting *Virginia v. Black*, 538 U.S. 343, 360 (2003)). The government should not be forced to curtail a witness's subjective perception of the defendant's interstate threats when that perception is directly relevant to an element of a charged crime.

Finally, the defendant's claim that he will be prejudiced by the term "manifesto" given that it "creates the implication that . . . this document is a clear written proclamation about Mr. Jiang's intentions to harm people to propagate his views" ignores that the defendant's own statements in the letter do that already. He explicitly lays out his grievances against the Christian God, details his plans to soon take out his anger at God against God's servants whom he believes were rewarded with life experiences he lacks, specifies that he plans to do so violently and soon, and makes clear he intends to die in the process. It is clear why the civilian witness who saw part of the letter characterized the letter as a "manifesto," and the government should not be precluded from doing so too.

## II. The Defendant's Dangerous Weapons In His Vehicle And Residence Are Admissible And Not Unfairly Prejudicial (ECF 43)

The defendant's second motion *in limine* moves to preclude a knife and cannister of oleoresin capsicum (OC) spray seized from the vehicle in which he drove to the Church and a cannister of bear spray seized from his residence. He claims that his "possession of these objects does not have anything to do with the charges in this case," because they were not on his person when he went inside the Church on Sunday morning. ECF 43 at 2. That assumes an incorrectly narrow view of relevance.

At the outset, law enforcement discovered more weapons in the defendant's car and residence than the defense identifies. The defendant in fact had *two* knives and *two* cannisters of chemical-irritant spray (one cannister of OC spray and one, bear spray) in his vehicle—all in addition to the loaded firearm, magazine, and two knives on his person and the extra loaded magazine, box of ammunition, and firearm case in his vehicle, which the defense does not move to preclude. And the defendant had yet another cannister of bear spray and other firearm paraphernalia at his residence.

All of this evidence is relevant. As detailed above, Rule 401 defines relevant evidence as evidence having any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. Put differently, "[e]vidence is relevant if it is sufficiently related to the charged offense." *United States v. Davis*, No. 23-4370, 2024 WL 368329, at *1 (4th Cir. Jan. 31, 2024) (quoting *United States v. Cowden*, 882 F.3d 464, 472 (4th Cir. 2018)). "[R]elevance typically presents a low barrier to admissibility. Indeed, to be admissible, evidence need only be worth consideration by the jury, or have a plus value." *Id.* (quoting *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (cleaned up), *abrogated on other grounds by United States v. Hart*, 91 F.4th 732 (4th Cir. 2024)); *see also United States v. Smallwood*, 306 F. Supp. 2d 582, 586 (E.D. Va. 2004) ("[S]ettled precedent makes clear that relevance typically presents a low barrier to admissibility.") (cleaned up).

That the defendant stored weapons in his vehicle is directly relevant to the government's argument that he was indeed attempting to commit mass violence that Sunday morning. The government will be required to prove, in part, that the defendant intended to obstruct people's free exercise of religious beliefs by force. True, part of the government's case will revolve around what the defendant was armed with when he entered the Church. But evidence that he

brought other weapons with him stored in his vehicle reveals that he indeed had violent intentions on his way to the Church in the same way other circumstantial evidence of his Google searches, social media posts, firearm store visits, and late-night casing of the Church all do. *See United States v. Smith,* 165 F.3d 913 at *4 (4th Cir. 1998) ("Although the evidence of intent is entirely circumstantial, intent is rarely proven by direct evidence. Rather, the factfinder must draw reasonable inferences from the available facts. This is so because intent concerns a defendant's state of mind, which-absent a confession-can only be inferred from conduct."); *see also United States v. Sawyer*, 294 F.2d 24, 31 (4th Cir. 1961) ("Great latitude is allowed in the reception of circumstantial evidence, especially where it is necessary to show a particular intent in a party as an essential ingredient of the crime with which he is charged.").

And the type of weapons makes all the difference. The knives were not just standard Swiss Army models with tools for everyday use. One knife sported a nearly six-inch fixed blade housed in a leather sheath equipped with clips for one's waist; the other was a folding knife with a multiple-inch blade and hinge mechanism for easy release of the blade. And the two cannisters of chemical-irritant spray also posed a danger. One cannister found in the center console was a law-enforcement-grade OC spray, and the other found in the front driver's side door compartment was a "Frontiersman Bear Attack Deterrent" for use to "deter bears and large cats from attacking humans." According to the Interagency Grizzly Bear Committee, bear spray is more dangerous than standard pepper spray, because it can "shoot farther," "cover a wider area," and has a higher concentrated percentage of potent chemicals.[27] Especially in light of the other evidence of the defendant' actions, searches, and statements leading up to September 24—which had nothing to do with hiking or bear hunting—these types of weapons he brought onto the

---

[27] igbconline.org/be-bear-aware/bear-spray/#1635183255783-41ec4507-cb56

crime scene are relevant and admissible.

Quantity and location matter too. The sheer number of weapons the defendant possessed on his person and in his vehicle is relevant evidence of his intent to commit violence. In all, he possessed a firearm, three magazines, extra ammunition, four knives, and three cannisters of chemical-irritant spray—all of which he brought to the Church except one cannister of bear spray. He then split those weapons up, bringing the loaded firearm, one magazine, and two knives into the Church, and leaving an additional magazine, a box of ammunition, two knives, and two cannisters of spray in his car. The defendant was well aware the Church was large (seating over 1,000 people on any given Sunday) and that his actions would generate a law enforcement response: he had been baptized by the Church, researched the Church, and looked online at how to disrupt 911 services and listen to police radios. His ability to commit violence *in* the Church and then later *outside* the Church from his car, against either congregants or law enforcement attempting to stop him, is relevant to whether he intended to obstruct religious practices by force that day.

That one cannister of bear spray was at his residence and not at the Church is of no moment. The defendant inappropriately tailors this evidence to only Count One, but it is also relevant that he possessed dangerous weapons at his residence when he posted threatening Instagram posts from there. As explained by the Supreme Court recently, the subjective intent of the issuer of a threat is now relevant and, in fact, required as part of the government's burden of proof to prove threats charges like that found in Count Three. *See Counterman*, 600 U.S. at 75 ("[T]he First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability."). Part of showing that the defendant was reckless in posting messages threatening violence online will include presenting circumstantial evidence of his mindset at the

time of posting those threats, including that he possessed multiple weapons and understood their danger. *See Smith,* 165 F.3d 913 at *4. Thus, the evidence he possessed bear spray at the place where he posted the threats at issue and drafted and printed his September 24 "Final letter" is relevant and admissible. The defendant remains free to argue how much weight the jury should give any of this evidence.

As for the defendant's alternative assertion that this evidence should be excluded under Federal Rule of Evidence 403, the caselaw points to the contrary. Rule 403 "is a rule of inclusion, generally favor[ing] admissibility." *Udeozor*, 515 F.3d at 264–65 (internal quotation marks omitted). It provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As the Fourth Circuit has observed, however, "all evidence suggesting guilt is prejudicial to a defendant." *Williams*, 445 F.3d at 730. That kind of general prejudice "is not enough to warrant exclusion of otherwise relevant, admissible evidence." *Siegel*, 536 F.3d at 319.

Instead, a court may exclude evidence under Rule 403 "only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence." *Id*. "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 'when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *United States v. Lentz*, 524 F.3d 501, 525 (4th Cir. 2008) (quoting *United States v. Aramony*, 88 F.3d 1369, 1378 (4th Cir. 1996)).

The sole decision the defendant offers—*United States v. Ham*, 998 F.2d 1247, 1252 (4th Cir. 1993)—relates to evidence admitted under Rule 404(b), including *other people's* prior bad acts. That is inapposite here. The weapons at issue are items the defendant, himself, had in his car and residence at the time of his alleged crimes, not other people's weapons or weapons he had in the past. Being equipped for violence wherever his plan took him—in the Church, in his car, or back at his home—is part and parcel of the defendant's alleged attempt to commit mass violence at Park Valley Church. Any prejudice he faces for having these weapons will be blunted by all of Jiang's statements and actions that already illustrate his desire for violence. Indeed, whatever additional prejudice stems from these weapons will be a result of general prejudice of his guilty intent. This falls far short of *substantially* outweighing the evidence's probative value. As always, the defendant is free to attempt to mitigate the impact of this evidence through cross-examination of witnesses as to the circumstances and availability of these items and through argument. But only after it has been admitted against him.

In short, the defendant is charged with attempting to obstruct by force others' free exercise of religion, using and possessing a firearm during and in furtherance of a crime of violence, and posting messages online threatening to harm others. Evidence that he had weapons stashed in places other than his person is of course relevant and not unfairly prejudicial.

## Conclusion

For the foregoing reasons, the defendant's motion to dismiss Count One as duplicitous (ECF 36), motion to strike Count One's aggravators (ECF 37), motion to dismiss Count Two for lacking a crime of violence predicate (ECF 38), motion to dismiss Count Two as duplicitous (ECF 39), and motion to strike the special findings as surplusage (ECF 40) should all be denied. Likewise, the defendant's motions *in limine* to preclude the term "manifesto" (ECF 42) and to preclude certain evidence seized from his vehicle and residence (ECF 43) should both be denied.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date:   May 14, 2024

_____
Troy A. Edwards, Jr.
Nicholas Durham
Assistant United States Attorneys
N.Y. Bar No. 5453741
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel: (703) 299-3746
Troy.edwards@usdoj.gov
Nicholas.durham@usdoj.gov

KRISTEN M. CLARKE
Assistant Attorney General
Civil Rights Division

*/s/Kyle Boynton*
KYLE BOYNTON
Trial Attorney
950 Pennsylvania Ave. NW
Washington, DC 20530
Phone: 202-598-0449
Kyle.Boynton@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2024, I filed the foregoing with the Office of the Clerk of Court electronically using the CM/ECF system, which will automatically send a notification of such filing to all counsel of record.

_____

Troy A. Edwards, Jr.
Assistant United States Attorney